# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY TORTORICE, SR., | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 17-2626 |
| MICHAEL BARNES, *et al.*, | |
| *Defendants.* | |

**PAPPERT, J.**                                                                 June 7, 2018

## MEMORANDUM

Anthony Tortorice, Sr. sued the International Alliance of Theatrical Stage Employees Local 8 and its President Michael Barnes, along with his previous employers, the Kimmel Center, Inc. and Elliott-Lewis Corporation, after investigation into his billing practices resulted in his suspension from the Union and loss of employment. The Union, Barnes, the Kimmel Center and Elliott-Lewis contend that Tortorice was fraudulently double-billing his employers, charging both for the same hours. Tortorice claims to the contrary that he was merely "multitasking," something he was allowed to do and of which the Defendants were fully aware.

Tortorice brings "hybrid" claims under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, against the Kimmel Center and Elliott-Lewis for breaching their Collective Bargaining Agreements with Local 8, and against the Union for breaching the duty of fair representation. He also alleges that the Union and Barnes retaliated against him in violation of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 411, 529.

Defendants move for summary judgment on all claims. The Kimmel Center, Elliott-Lewis and the Union argue that the Section 301 claims are barred by the applicable six-month statute of limitations. They also contend they are entitled to judgment on the merits of those claims because Tortorice has not presented any evidence that Elliott-Lewis or the Kimmel Center lacked just cause for their actions or that the Union acted arbitrarily or capriciously when it decided not to pursue a grievance on his behalf. Finally, Barnes and the Union contend that the LMRDA claim fails because Tortorice has not established any causal connection between the exercise of his rights as a union member and the Union's adverse actions.

After thoroughly reviewing the record and hearing oral argument, the Court grants the Kimmel Center and Elliott-Lewis' Motions and grants in part and denies in part the Motion filed by the Union and Barnes. Judgment is entered in favor of the Kimmel Center and Elliott-Lewis. Judgment is also entered in the Union's favor on the claims alleging breach of the duty of fair representation. The jurors will decide Tortorice's LMRDA claim against Barnes and the Union.

I

A

Tortorice has been a member of the Union since 1984, serving as its Vice President under Barnes for nine years. (Local 8 Mot. for Summ. J., Ex. A ("Tortorice Dep.") at 14, 16–17, ECF No. 54; Resp. to Local 8 Mot., Ex. P at ¶¶ 1, 3, ECF No. 62; Compl. at ¶¶ 9–10, ECF No. 1.) For approximately twenty years, Tortorice was the Head Carpenter and Steward at the Merriam Theater, which the Kimmel Center acquired in 2009. (Tortorice Dep. at 15–17, 22; Local 8 Mot., Ex. H ("Dillon Dep.") at 8.)

A CBA between the Kimmel Center and the Union governed the terms and conditions of Tortorice's employment at the Merriam. (*See* Elliott-Lewis Mot. for Summ. J., Ex. J ("Kimmel CBA"), ECF No. 56; Tortorice Dep. at 19.) The Kimmel CBA provides that an employee may be disciplined and discharged for just cause, including but not limited to dishonesty and "the intentional submittal of false reports and time sheets." (Kimmel CBA at 23.) It states further that grievances shall be submitted in writing by the employee or the Union within seven calendar days. (*Id*. at 24.) If the grievance is not satisfactorily resolved within ten days of filing, the Union is permitted to treat the grievance as denied and proceed to arbitration. (*Id*.)

Starting in 2008, in addition to his role at the Merriam, Tortorice worked for Elliott-Lewis as union Steward in the Pennsylvania Convention Center. (Tortorice Dep. at 35, 38, 57.) The Convention Center is managed by SMG, a management company, and Elliott-Lewis serves as the labor and payroll service provider. (*Id*. at 36–41; Elliott-Lewis Mot., Ex. B ("Gentile Dep.") at 7; Customer Satisfaction Agreement ("CSA") at 7.) Tortorice's employment at the Convention Center was governed by a separate CBA between the Union and Elliott-Lewis as well as a Customer Satisfaction Agreement between the Union, Elliott-Lewis, SMG and the Pennsylvania Convention Center Authority.[1] (*See* Elliott-Lewis Mot., Ex. C ("Elliott-Lewis CBA"); Customer Satisfaction Agreement.)

The Elliott-Lewis CBA provides that the employer has the right to replace or dismiss any employee for just cause, including but not limited to dishonesty, theft or

---

[1]     In 2003, the Convention Center Authority entered into the Customer Satisfaction Agreement with the Union and other local unions to enhance labor productivity and cost effectiveness at the Convention Center. The CSA was entered into as an addendum to the parties' respective CBAs covering work performed at the Convention Center. The CSA was renegotiated and revised in May 2014. (*See* Customer Satisfaction Agreement at 2, 6, 30.)

criminal conduct. (Elliott-Lewis CBA at 5.) It also states that grievances shall be submitted orally by the employee or the Union to the General Manager within five calendar days. (*Id*.) If the grievance is not satisfactorily resolved by the General Manager within ten days of the facts giving rise to the grievance, the grievance shall be submitted by the Union in writing pursuant to Step Two of the grievance procedure. (*Id*.) Elliott-Lewis is required to respond within five calendar days, after which time a meeting is held between the Union and the employer in a good faith attempt to settle the dispute. (*Id*. at 6.) If the grievance is not satisfactorily resolved within five calendar days of the meeting, either party may proceed to arbitration at Step Three. (*Id*.)

The Union's Constitution and By-Laws govern the discipline of members for violations of union rules and provide the procedure for internal appeals of adverse Union decisions. (Local 8 Mot., Ex. F "Constitution & By-Laws.") The Union may discipline any member who engages in "conduct as is detrimental to the advancement of . . . or as would reflect discreditably upon the [Union.]" (*Id*. at Art. VIII, Section 1.) Union members are guaranteed a fair trial and the right to present a defense, confront all witnesses and review all the evidence. (*Id*. at Art. VIII, Sections 2 & 15.) If the member disagrees with the outcome of the trial, appeals may be taken to the International President and then the General Executive Board. (*Id*. at Art. IX, Section 1.) The Constitution provides that "under no circumstances" may members "resort to outside tribunals" until internal union appeals have been exhausted. (*Id*. at Art. IX, Section 6.) The By-Laws govern the filing of grievances with employers, stating that members "shall not take action of any kind, whatsoever[,]" including making a demand

on an employer for the redress of grievances "but shall refer such matters to [the Union]." (*Id*. at Art. X.) If a member fails to comply with this provision, they "shall be suspended." (*Id*.)

B

In approximately June 2014, pursuant to an agreement between the Union and SMG, Tortorice was guaranteed "a minimum of 40 hours straight time by the [Convention Center] at the steward rate." (Resp. to Local 8, Ex. A; Local 8 Mot., Ex. C ("Mar. 26 Barnes Dep.") at 71–73; Tortorice Dep. at 50.) In the spring of 2016, Robert McClintock, SMG's Senior Vice President and Chief Operating Officer, and Barnes began negotiating, among other things, an extension of Tortorice's 40-hour guarantee. (Local 8 Mot., Ex. E ("McClintock Aff.") at ¶ 3; Resp. to Local 8 Mot., Ex. CC "Union Trial Tr." at 36–37.) During the course of those negotiations, McClintock became concerned that Tortorice was leaving the Convention Center to work at other venues while he "should have been present and working at the [Convention Center]." (McClintock Aff. at ¶ 4.) In late May, McClintock told Barnes of his concerns and "initiated an investigation into whether Mr. Tortorice was simultaneously working at the [Convention Center] and other venues." (*Id*. at ¶ 5; Local 8 Mot., Ex. D ("Mar. 28 Barnes Dep.") at 12 ("[H]e informed me that . . . Tortorice was working for multiple employers around the city, at the same time[.]"))

Barnes began to look into Tortorice's conduct as well. (Mar. 26 Barnes Dep. at 103–04, 108.) Around June 27, Barnes obtained records from the Union's Annuity Fund, which showed Tortorice's total earnings and benefit fund contributions. (Mar. 26 Barnes Dep. at 108, 121–22; Mar. 28 Barnes Dep. at 4.) Barnes concluded that

5

Tortorice's contributions evidenced "billing irregularities" and accordingly brought the records to David Kenney, a previous Union benefit trustee, for review. (Mar. 26 Barnes Dep. at 108.) After Kenney reached the same conclusion, Barnes asked Kenney if he would be willing to file charges against Tortorice and Kenney agreed to do so. (*Id*. at 108–09; Union Trial Tr. at 38.)

On June 29, based on the fund contribution records, Kenney filed internal union charges against Tortorice for fraudulently submitting duplicative billing for the same hours on the same days to the Convention Center and the Merriam, and of engaging in conduct to conceal his behavior. (Resp. to Local 8 Mot., Ex. X; Mar. 26 Barnes Dep. at 108, 121; Mar. 28 Barnes Dep. at 4–6.) The next day, the Union's Executive Board approved the charges and scheduled Tortorice's trial for July 26. (Resp. to Local 8 Mot., Ex. Y.) At some point thereafter, but before his trial, the Union sought and obtained Tortorice's payroll records from the Kimmel Center and Elliott-Lewis. (*See* Local 8 Mot., Ex. D at 8 ("As you also know, Local 8 is requesting any payroll, time and attendance etc. information regarding Mr. Tortorice from SMG[.]"); Mar. 28 Barnes Dep. at 4; Union Trial Tr. at 39; Dillon Dep. at 19–21.)

On July 6, SMG General Manager Lorenz Hassenstein sent Tortorice a letter suspending him from working at the Convention Center pending further investigation into Tortorice's time and attendance records. (Local 8 Mot., Ex. I.) On July 12, Barnes emailed Tortorice stating that "[t]he Local is in the process of scheduling a meeting as outlined in Step 2 of the Grievance procedure." (Resp. to Local 8, Ex. H.) On July 13, Union counsel Joseph Cleary emailed counsel for Elliott-Lewis confirming that the Union "sent a letter to Mr. Hassenstein requesting a meeting so as to pursue the unions

[sic] grievance on behalf of Mr. Tortorice" and seeking an extension, which SMG and Elliott-Lewis granted, of the grievance procedure time limits.  (Local 8 Mot., Ex. D at 8.)

On July 15, Barnes sent Tortorice another email telling him that he was also suspended by the Kimmel Center[2] and that "[t]he union will be representing your interest as outlined in the contract between the parties."  (Resp. to Local 8, Ex. H.)  Tortorice "definitively" understood Barnes' email to mean that the Union would be pursuing a grievance on his behalf.  (Tortorice Dep. at 115–16.)  On July 18, Tortorice sent an email to Cleary, copying Barnes, regarding his understanding that grievances were being filed with both Elliott-Lewis and the Kimmel Center and requesting an update on their status.  (Resp. to Local 8 Mot., Ex. L.)

Tortorice's internal union trial was held on July 26 with Barnes serving as the "prosecution."  (*See* Union Trial Tr.)  Barnes submitted as evidence the fund contribution records as well as 2014 – 2016 payroll records from the Kimmel Center and Elliott-Lewis.  The payroll records showed between 18 to 22 hours worked between both venues on various days.  (*Id*. at 41–43.)  At the trial, Tortorice relied on his 40-hour guarantee with SMG and cross-examined Kenney and Barnes on their motivation for bringing the charges, including personal animus against him.  (*Id*. at 46, 54, 58–60, 98–100.)  Tortorice argued that his 40-hour guarantee functioned as a "salary," allowing him to be paid for holidays and days off.  (*Id*. at 114–15.)  In light of this salary arrangement, Tortorice contended that he was not fraudulently double-billing.  Further, Tortorice questioned Barnes about an argument they had over executive board salary increases and stated that he believed the charges and trial were in retaliation for

---

[2]     Tortorice was later terminated by the Kimmel Center on August 25, 2016. (Local 8 Mot., Ex. J.)

speaking out against Barnes' leadership over the past two years.  (*Id.* at 90–92, 135–38.)  Tortorice was found guilty by the Trial Committee and expelled from the Union for ten years, assessed a $5,000 fine, put on lifetime probation and suspended from the hall referral list for 4 years.[3]  (Local 8 Mot., Ex. L.)

On July 29 and August 3, Tortorice filed charges with the National Labor Relations Board against the Union, the Kimmel Center, Elliott-Lewis, SMG and the Convention Center Authortiy.  He contended that the Union revoked his membership because he "engaged in dissident intraunion activities in opposition to the current Union leadership" and "caused the Pennsylvania Convention Center and the Kimmel Center to suspend [him]."[4]  (Elliott-Lewis Mot., Ex. K.)

On September 10, Tortorice filed an internal union appeal with Matthew Loeb, the International President of the Alliance of Theatrical Stage Employees.  (Resp. to Local 8 Mot., Ex. P.)  He argued that the Union subjected him to intolerable abuses in retaliation for opposing current leadership.  (*Id.*)  His appeal recounted a history of recent opposition to Barnes leading up to his charges and trial, and refers to his suspension letters from the Kimmel Center and Elliott-Lewis.  Grounds for his appeal included Barnes' allegedly unfair conduct, the unfounded nature of the charges, the unfair nature of his trial, and the excessiveness of the Union's punishment.  Loeb affirmed the Trial Committee's decision on January 6, 2017.  (Resp. to Local 8 Mot., Ex. Q.)  On February 3, Tortorice appealed Loeb's decision to the General Executive Board.  (Resp. to Local 8 Mot., Ex. R.)  On May 11, the Board denied his appeal, exhausting the

---

[3]     The hiring hall referral list is the mechanism through which unions dispatches available work to eligible workers.

[4]     Tortorice voluntarily withdrew his NLRB charges on September 22, 2016.  (Elliott-Lewis Mot., Ex. L.)

internal appeals process (Resp. to Local 8 Mot., Ex. S) and Tortorice filed this lawsuit on June 12, 2017 (Compl.).

## II

Summary judgment is proper if the pleadings, discovery, disclosure materials and any affidavits show that there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party. *Id.* at 252. Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

III

Hybrid Section 301 cases are those in which employees bring claims against their employer for breaching the CBA and their union for violating the duty of fair representation. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163–64 (1983). Ordinarily, an employee must exhaust the CBA's grievance procedures before filing a Section 301 claim against his or her employer for breaching a CBA. *Id.* (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650 (1965)). However, there is an exception to this policy "when the union representing the employee . . . acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation" and effectively prohibits relief under the CBA's grievance procedures. *DelCostello*, 462 U.S. at 164. "Such a hybrid action really alleges that the process of collective bargaining has broken down." *Keister v. PPL Corp.*, 253 F. Supp. 3d 760, 770 (M.D. Pa. 2015) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 593 (3d Cir. 2005)).

The claims against the employer and union "'are inextricably interdependent. "To prevail against either[,] . . . employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union."'" *DelCostello*, 462 U.S. at 164–65 (quoting *United Parcel Serv., Inc., v. Mitchell*, 451 U.S. 56, 66–67 (1981) (Stewart, J., concurring in the judgment)). Thus, a plaintiff's failure to raise a genuine issue of material fact as to either claim is fatal to both. *See Bliesner v. Commc'n Workers of Am.*, 464 F.3d 910, 914 (9th Cir. 2006).

IV

A

The Union, Kimmel Center and Elliott-Lewis argue that Tortorice's hybrid

claims are barred by the applicable six-month statute of limitations. Hybrid Section

301 claims ordinarily must be filed within six months of the date the claims accrued.

*Vadino v. A. Valey Eng'rs*, 903 F.2d 253, 260 (3d Cir. 1990) ("The six-month period

commences 'when the claimant discovers, or in the exercise of reasonable diligence

should have discovered, the acts constituting the alleged violation.'" (quoting *Hersh v.

Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir. 1986))). The commencement of the

statutory period on claims against employers, however, is tolled until the claims

against the unions accrue because the union's breach of its duty is a necessary

precondition to the claim against the employer. *See Vadino*, 903 F.2d at 261; *see also*

*Albright v. Virtue*, 273 F.3d 564, 576 (3d Cir. 2001). Thus, the statute of limitations

applicable to Section 301 claims begins to run when (1) "'the plaintiff receives notice

that the union will proceed no further with the grievance,'" *Vadino*, 903 F.2d at 260

(quoting *Hersh*, 789 F.2d at 232), or (2) "if there has been no explicit notice, . . . when

'the futility of further union appeals became apparent or should have become

apparent[,]'" *Vadino*, 903 F.2d at 260 (quoting *Scott v. Local 863, Int'l Bhd. of*

*Teamsters*, 725 F.2d 226, 229 (3d Cir. 1984)).

This approach "has been characterized as 'court-inspired vagueness,' [which]

makes these cases difficult." *Albright*, 273 F.3d at 573 (quoting *Scott*, 725 F.2d at 230);

*see also Keister*, 253 F. Supp. 3d at 772. It requires a "case-by-case factual standard,"

*Keister*, 253 F. Supp. 3d at 772 (quoting *Scott*, 725 F.2d at 229), under which "'courts

are faced with the challenge of determining when the futility of appeals was or should have been "clear" to the plaintiffs, thereby triggering the statute of limitations,'" *Luongo v. Vill. Supermarket, Inc.*, No. 17–0659, 2017 WL 2399088, at \*4 (D.N.J. June 2, 2017) (quoting *Albright*, 273 F.3d at 573).

The Union, Kimmel Center and Elliott-Lewis argue that the statute of limitations began to run on July 26, 2016, when Tortorice was found guilty at his union trial and, among other things, expelled from the Union. (Local 8 Memo. at 13; Elliott-Lewis Memo. at 11–12; Kimmel Memo. at 11–12.) They assert that following Tortorice's trial and expulsion, he knew or reasonably should have known that the Union would not be pursuing a grievance on his behalf. (*Id.*) Alternatively, Defendants claim that Tortorice's claims accrued, at the very latest, in September 2016 when Tortorice filed his internal union appeal, in which he accuses Barnes and the Union of retaliating against him. (*Id.*) They further contend that Tortorice's appeal did not pertain to the Union's grievance decision and that any appeal of that decision was futile because it could not result in his reinstatement with the Kimmel Center or Elliott-Lewis. (Local 8 Memo. at 12; Hr'g Tr. at 88.) Tortorice argues that he received explicit notice from the Union that it would pursue his grievances and that the futility of further union appeals did not become clear, and thus the statute of limitations did not begin to run, until he exhausted his internal appeal rights on May 11, 2017, making his complaint, filed the following month, timely. (Resp. to Local 8 at 14.)

Tortorice relies heavily on representations made by Barnes and others at the Union in the weeks before his trial indicating that the Union would represent him in grievances with the Kimmel Center and Elliott-Lewis. Regardless of what Barnes or

the Union told Tortorice prior to July 26, 2016, it was or should have been clear to him upon his conviction and expulsion that the Union would no longer represent his interests in any grievances against the Kimmel Center or Elliott-Lewis. That does not, however, end the inquiry since the limitations period was tolled until the futility of his internal appeals became, or should have become, apparent to Tortorice.[5]

The parties dispute whether Tortorice's internal union appeal fairly encompassed the Union's decision not to file or pursue grievances on Tortorice's behalf; if it did the limitations period was tolled until the May 2017 exhaustion of that appeal process.[6] The Union's Constitution and By-Laws required Tortorice to exhaust his internal union appeals prior to filing suit. (Constitution & By-Laws at Art. IX.) Although his appeal does not directly state that the Union failed to grieve his suspensions and subsequent termination, it does refer to the correspondence he received from his employers regarding his suspensions and that issue is arguably intertwined with the union's investigation and eventual conviction and suspension of

---

[5] Defendants argue that the CBAs allow employees to bring their own grievances and that Tortorice could have done so here. The Union's Constitution and By-Laws, however, specifically preclude Tortorice from doing so, raising a genuine issue of material fact with respect to whether the Union's failure to pursue grievances caused Tortorice any harm. For his part, Tortorice testified that he believed he would be charged and suspended by the Union if he contacted his employers regarding his grievances. (Tortorice Dep. at 167–69.)

[6] The Union's arguments regarding the futility of the internal union appeal are unavailing. In *Scott*, 725 F.2d 226, rather than adopting the standards for futility for excusing a union member's failure to exhaust internal union remedies as set forth by the Supreme Court in *Clayton v. Automobile Workers*, 451 U.S. 679, 689–93 (1981), the Third Circuit explicitly deferred "defin[ing] the precise criteria by which a district court is to determine when the point of futility is reached in internal union proceedings for purposes of tolling the statute of limitations." *Scott*, 725 F.2d at 229 n.2. Rather, district courts were left to make that assessment on a case-by-case factual basis. (*Id.*)
The Union Constitution and By-Laws require a member to exhaust the union appeal process before resorting to court. If a union member, in good faith, appeals a local's decision not to pursue a grievance or arbitration based on the union's rules before seeking judicial intervention, the limitations period may be tolled during that time. *See Williams v. Chrysler Corp.*, 163 F.3d 183 (3d Cir. 1998) (holding limitations period tolled until final decision in internal appeal of union's decision to withdraw grievance, but not to untimely motion for reconsideration of final decision).

13

Tortorice. The very unique facts of this case make the typical "court-inspired vagueness" even murkier here. *See Albright*, 273 F.3d at 573. The Court does not need to navigate through the fog, however, because even if the Section 301 claims are not time-barred, no reasonable jury could return a verdict for Tortorice on them.

B

To prevail on his hybrid claims, Tortorice must show that his suspensions and termination breached the respective CBAs. *Matos v. Kurz-Hastings, Inc.*, 701 F. Supp. 1135, 1139 (E.D. Pa. 1988), *aff'd*, 879 F.2d 858 (3d Cir. 1989) (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71 (1976)). The determination of whether an employer breached a CBA is governed by traditional rules of contract interpretation. *Heffron v. Adamar of N.J., Inc.*, 270 F. Supp. 2d 562, 570 (D.N.J. 2003) (citing *Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993)). The CBAs in this case each provided that Tortorice could be discharged for "just cause." (Elliott-Lewis CBA at 5; Kimmel CBA at 23.)

The just cause standard, although it does not have an exact definition in the labor relations context, is a negotiated limit on "the employer's otherwise unfettered right to discharge and discipline employees." *Office of Att'y Gen. v. Council 13, Am. Fed'n of State, Cty. Mun. Emps.*, 844 A.2d 1217, 1224–25 (Pa. 2004); *see also Watson v. Riverside Osteopathic Hosp.*, 78 F. Supp. 2d 634, 645 (E.D. Mich. 1999) (analyzing just cause as "whether [the employer's] specific decision to discharge Plaintiff was unduly harsh, arbitrary, or inconsistent with its prior practice of employee discipline"); *Int'l Union of Operating Engineers, Local 716 v. Delaware River Port Auth.*, No. 97-6138, 1998 WL 951503, at *29 (D.N.J. Dec. 22, 1998) ("The 'just cause' standard is a flexible

14

concept that is capable of being applied to the myriad of situations that may arise in the workplace."). In Pennsylvania, some of the factors that may be considered in determining whether there is just cause for discharge or discipline are pre- and post-discharge misconduct and whether there was an investigation. *Council 13*, 844 A.2d at 1224–25.

Tortorice bears the burden of proving that his employers' actions breached their respective CBAs. *Heffron*, 270 F. Supp. 2d at 575 (citing *United Steelworkers of America, AFL–CIO–CLC v. North Bend Terminal Co.*, 752 F.2d 256, 261 (6th Cir. 1985) ("[T]he whole burden of proof is on the party alleging breach of a collective bargaining agreement under section 301 of the LMRA.")). To survive summary judgment, he "must point to concrete evidence in the record which supports each essential element" of his claims, as he bears the burden of proof at trial. *Heffron*, 270 F. Supp. 2d at 575 (D.N.J. 2003) (quotation omitted). Tortorice has not done so.

i

It is undisputed that Elliott-Lewis itself did not take or influence any adverse or disciplinary action against Tortorice, (Tortorice Dep. at 131; Hr'g Tr. at 58–59, 61 ("[W]e concede that there is no active participation by Elliott-Lewis.")); SMG, as the management company, suspended him, (Local 8 Mot., Ex. I). To survive summary judgment against Elliott-Lewis, Tortorice resorts to arguing that an alleged agency relationship existed between Elliott-Lewis and SMG such that Elliott-Lewis is responsible, as the "principal," for SMG's conduct as the "agent." (Resp. to Elliott-Lewis Mot. at 18; Hr'g Tr. at 59–60 ("Elliott-Lewis on a *respondeat superior* basis is the responsible party.").)

Tortorice provides no support, factually, legally or otherwise, for this theory. "The law is clear in Pennsylvania that the three basic elements of agency are: 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000) (quotation omitted). Tortorice points to the Side Letter Agreement[7] to the Elliott-Lewis CBA, in which SMG is a signatory, as evidence of an agency relationship. At oral argument, counsel further contended that the Customer Satisfaction Agreement establishes that the Pennsylvania Convention Center Authority, SMG and Elliott-Lewis "are all agents of one another." (Hr'g Tr. at 63.) He argued that, by signing the CSA, the parties agreed to be "on the hook" for every decision that every one of them made. (*Id*.) The fact that parties enter into a contract does not automatically establish an agency relationship between and among them and, in fact, the Agreements cited by counsel fail to show any of the three basic elements of agency required under Pennsylvania law to establish that SMG acted as the agent of Elliott-Lewis. There is no evidence in the record that Elliott-Lewis breached its CBA with the Union, and judgment must be entered in favor of Elliott-Lewis accordingly.

ii

Nor has Tortorice pointed to sufficient record evidence to create a genuine issue for the jury with respect to whether the Kimmel Center breached its CBA. The Kimmel Center fired Tortorice for falsifying his time records and submitting fraudulent payroll information—seeking payment for time where he was scheduled to be working for the

---

[7] In approximately June 2014, the parties to the Elliott-Lewis CBA, as well as SMG, executed a Side Letter Agreement that modified the CBA. The Side Letter Agreement clarified wage rate adjustments to those contained in the CBA. (Elliott-Lewis Mot., Ex. C.)

Kimmel Center but was instead working for another employer. (Local 8 Mot., Ex. J.) Tortorice argues that his "billing practices and multitasking procedures were known to Kimmel and deemed proper" by a prior arbitration decision and that he did not intend to defraud the Kimmel Center, because when submitting his timesheets, he reasonably relied on his 40-hour guarantee or "salary" arrangement with Elliott-Lewis and SMG and the arbitration decision. (Resp. to Kimmel Mot. at 19.)

The record evidence demonstrates that Kimmel Center had a reasonable basis, and therefore just cause, for terminating Tortorice. As an hourly worker for the Kimmel Center, Tortorice was permitted to bill only for the time he worked at the Merriam. (*See* Kimmel CBA.) After receiving a request from the Union for Tortorice's payroll records, the Kimmel Center investigated his billing practices. (Dillon Dep. at 19–21, 25.) The Kimmel Center compiled a list of Tortorice's time entries for the Merriam and compared them to payroll records it obtained from Elliott-Lewis for Tortorice's work at the Convention Center. (*Id*. at 25–27.) The comparison showed that Tortorice was billing the Kimmel Center for the very same hours he was also billing Elliott-Lewis. (*See id*.) Tortorice contends that the Kimmel Center did not fairly or thoroughly investigate his billing practices before firing him because it did not interview him. (Hr'g Tr. at 66, 68–69.) Nothing required the Kimmel Center to interview Tortorice; it obtained payroll records that showed double-billing. At that point, it had just cause.

Indeed, Tortorice acknowledges that the submission of false timesheets is wrong and does not deny that he submitted duplicative billing. He stated in his deposition that it is wrong for an employee to submit a timesheet indicating that he or she worked

17

at one location when, in fact, he or she worked at a different location for another employer without permission. (Tortorice Dep. at 79–81.) He further admitted in a sworn affidavit that his "hours working at the Convention Center and the Merriam Theater overlapped each other on some occasions" (Elliott-Lewis Mot., Ex. L at 4) and stated during his union trial that "I would be willing to say probably 90 percent of the time . . . I tried my best not to [overlap my hours] unless I got jammed up and they needed me there," (Union Trial Tr. at 124). Rather, Tororice argues that his "multitasking" was permitted under his 40 hour guarantee "salary" arrangement and that the Kimmel Center knew as much. He relies in large part on a 2015 arbitration decision pertaining to a separate dispute with the Kimmel Center. He claims that the decision concluded that "multitasking is allowed" and the billing practices at issue here were "deemed proper." (Hr'g Tr. at 69; Resp. to Kimmel at 19.) The 2015 decision did no such thing.

That proceeding dealt with a very different and distinct issue, namely compensation for "pre-production work"[8] completed by Tortorice outside of his regularly scheduled hours at the Merriam. (Resp. to Local 8, Ex. C "2015 Arbitration Decision".) Pursuant to a term in the CBA, Tortorice sought a minimum of 8 hours of pay for each show for which he rendered pre-production assistance, even if the work only took a couple of minutes. (*Id*.) The arbitrator agreed that Tortorice should be compensated for pre-production work, but rejected his position that he was entitled to a minimum of 8 hours of pay for each pre-production call or email. (*Id*.) The arbitrator concluded

---

[8] As part of his role as Head Carpenter at the Merriam, Tortorice was required to review show riders and stage plots in order to provide input to Merriam's Production Manager on the feasibility or needs of the physical layout as well as the required staffing. (*See* 2015 Arbitration Decision at 4, Dillion Dep. at 10.)

instead that Tortorice should be compensated for the actual time he spent on pre-production work, rounded up to the nearest hour.  (*Id.*)

In so finding, the arbitrator also rejected the Kimmel Center's argument that the compensation due should be offset by time he spent working for another employer.  The arbitrator stated, "There is little reason to believe that [Tortorice] would have been required to perform that pre-production work during hours he was working for another employer."  (*Id.* at 20.)  The arbitrator further said that "the time [Tortorice] spent working for Merriam on pre-production matters could be in addition to, not in place of, time he spent working elsewhere."  (*Id.*)  The decision plainly did not sanction the practice of billing two separate employers for the same hours on the same days.[9]

Finally, Tortorice claims that the record contains "supporting documentation" to "explain his multitasking," and why he thought his billing practices were permissible. (Hr'g Tr. at 66, 68–69.)  The record contains no such documentation or evidence.  Even if the jury were to conclude that Tortorice's 40-hour guarantee functioned as a salary, as he claims, effectively allowing him to come and go from the Convention Center as he pleased, the record does not contain "supporting documentation" from which the jury could conclude that his salary arrangement allowed him to work remotely for the Convention Center *while on call at the Merriam*.  (*See* Hr'g Tr. at 68 ("[I]n this day and age of computers, he can be working on one thing . . . for one house and still be in another house."; *id.* at 72 ("He's sitting in the Merriam and he's doing work for the

---

[9] Tortorice points also to a post-hearing brief from the 2015 proceeding submitted by the Kimmel Center's counsel (the same lawyer representing the Kimmel Center in this case) in support of his argument that the Kimmel Center knew and approved of his "multitasking." Contrary to Tortorice's interpretation of the argument, the brief notes that if Tortorice was in fact billing two different employers for the same hours, his conduct would be "outrageous" and he would be "defrauding both employers[.]"  (Resp. to Local 8, Ex. D at 14 n.5.)

Convention Center."). There is no evidence that such an arrangement was accepted, permitted, tolerated or excused by the Kimmel Center or acceptable under the clear terms of the CBA, which prohibit the submittal of false time sheets.

Because Tortorice cannot show that either Elliott-Lewis or the Kimmel Center breached their respective CBAs, judgment must also be entered for the Union on the claims alleging breach of the duty of fair representation.

## V

Finally, the Court denies the Union and Barnes' Motion with respect to the LMRDA claim. "Title I of the LMRDA sets forth a bill of rights for members of labor organizations, and includes, as relevant here, the right to freedom of speech and safeguards against improper disciplinary action." *Kehoe v. Int'l Ass'n of Theatrical Stage Emps. Local 21*, 682 F. App'x 161, 163 (3d Cir. 2017) (citing 29 U.S.C. § 411) (internal citations omitted). It was "designed to protect rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers." *Kowaleviocz v. Local 333 of Int'l Longshoremen's Ass'n*, 942 F.2d 285, 288 (4th Cir. 1991); *see also Graham v. Soloner*, 220 F. Supp. 711, 714 (E.D. Pa. 1963) ("The clear intent of Congress in enacting this legislation was to 'prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain.'" (quoting *Salzhandler v. Caputo*, 316 F.2d 445, 449 (2d Cir. 1963))). "[I]nfringement of a union member's free speech must be viewed with reference to the basic objective of the LMRDA: 'to ensure that unions are democratically governed, and responsive to the will of the union membership.'" *Montgomery v. Laborers Dist. Council of Phila. & Vicinity*, No. 15-02815, 2015 WL 4522917, at *4 (E.D.

Pa. July 27, 2015) (quoting *Finnegan v. Leu*, 456 U.S. 431, 441 (1982)). Section 609 provides that "[i]t shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter." *Knight v. Int'l Longshoremen's Ass'n*, 286 F. Supp. 2d 360, 366 (D. Del. 2003) (quoting 29 U.S.C.A. § 529).

Further, Section 101(a)(5) guarantees all members of unions "a full and fair hearing" before they can be disciplined, *Knight v. Int'l Longshoremen's Ass'n*, 457 F.3d 331, 339–40 (3d Cir. 2006), and attempts "to ensure procedural due process to [union] members . . . and to provide for democratic processes in the conduct of union affairs." *Kowaleviocz*, 942 F.2d at 288. "'[W]hat constitutes a full and fair hearing in a union disciplinary proceeding must be determined from the traditional concepts of due process of law, the common law precepts governing the judicial control of internal union affairs and the sparse case law since the adoption of the LMRDA.'" *Knight*, 457 F.3d at 339–40 (quoting *Falcone v. Dantinne*, 420 F.2d 1157, 1165 (3d Cir. 1969)). The Third Circuit has held that this guarantee includes the right to a hearing before an unbiased committee. *Id*. at 342 (citing *Falcone*, 420 F.2d at 1165).

Barnes and the Union contend that there is no evidence that the charges and union trial were improper or motivated by retaliation. They argue that the Union conducted an independent investigation into Tortorice's billing practices and punished him for billing and accepting pay from two different employers on the same days for the same hours. (Local 8 Memo. at 20.) Tortorice claims that he was brought up on bogus

charges in a "kangaroo court" because he opposed Barnes.  (Resp. to Local 8 at 8; Resp. to Local 8, Ex. B at 1.)

At a minimum, there is a genuine issue of material fact with respect to whether Tortorice was given a fair union trial, including whether the tribunal that convicted him was truly impartial.  Tortorice contends that the Trial Committee was biased and influenced by Barnes, precluding the possibility of a fair trial.  (Resp. to Local 8 at 9.) He asserts that the Trial Committee included Barnes' son-in-law Kevin Beebe and Drew Nolan, who were appointed to the Executive Board by Barnes in alleged contravention of Union procedures.  (Resp. to Local 8 Mot., Ex. P at ¶ 6, 102–105.)  He further contends that Nolan actively opposed him prior to the trial, including refusing members work if they supported Tortorice and telling other members that he stole money.  (*Id*. at ¶¶ 74–77, 94, 119.)  At trial, Tortorice requested to have both Beebe and Nolan removed from the Trial Committee, but his request was denied.  (Union Trial Tr. at 16–23.)

In short, the record does not allow the Court to conclude, as a matter of law, that judgment should be entered for Barnes and the Union on this claim.  The jury can determine whether Tortorice's criticism of Barnes fueled the charges and deprived Tortorice of the fair hearing and due process to which he was entitled.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.